# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# GREENSBORO DIVISION

|  |  |
|---|---|
| PURESHIELD, INC. AND VIACLEAN TECHNOLOGIES, LLC, | |
| Plaintiffs, | Case No. 20-cv-1025 |
| v. | **JURY TRIAL DEMANDED** |
| INHOLD, LLC AND NOVALENT, LTD., | |
| Defendants. | |

## COMPLAINT

Plaintiffs PureShield, Inc. ("PureShield") and ViaClean Technologies, LLC ("ViaClean") (collectively, "Plaintiffs") bring this Complaint against Defendants Inhold, LLC ("Inhold") and Novalent, Ltd. ("Novalent") (collectively, "Defendants"), and hereby allege as follows:

### NATURE OF THE ACTION

1.     This is a civil action brought by Plaintiffs against Defendants for (a) declaratory judgment arising under 28 U.S.C. §§ 2201 *et seq*. that Plaintiffs have all substantial rights in and to ten (10) United States patents with full and unfettered rights to practice, license, and enforce each of the patents under the patent laws of

the United States pursuant to 35 U.S.C. §§ 1 *et seq.*,[1] (b) breach of contract arising under North Carolina law, (c) actual and constructive fraud arising under North Carolina law, (d) unfair competition arising under North Carolina's Unfair and Deceptive Trade Practices Act—N.C. Gen. Stat. §§ 75 *et seq.*, and (e) tortious interference with existing and prospective business relations arising under North Carolina law.

2.     Plaintiffs are industry leaders in the field of sophisticated antimicrobial products that provide lasting protection against pathogens on applied surfaces.  Over the years, PureShield has cemented its place at the forefront of providing and commercializing antimicrobial technologies that combat the ubiquitous spread of pathogens threatening everyday life—including dangerous viruses such as COVID-19.  More recently, PureShield has joined forces with its parent company ViaClean to facilitate the supply of effective products in the critical fight against pathogens.     Together, Plaintiffs provide nano-surface protectants such as BIOPROTECT-500, -7200, and -RTU.

---

[1] The ten (10) patents at issue are:  U.S. Patent No. 5,954,869 ("'869 patent"); U.S. Patent No. 6,113,815 ("'815 patent"); U.S. Patent No. 6,120,587 ("'587 patent"); U.S. Patent No. 6,762,172 ("'172 patent"); U.S. Patent No. 9,624,384 ("'384 patent); U.S. Patent No. 9,744,120 ("'120 patent"); U.S. Patent No. 10,010,080 ("'080 patent"); U.S. Patent No. 10,328,020 ("'020 patent"); U.S. Patent No. 10,405,553 ("'553 patent"); and U.S. Patent No. 10,531,664 ("'664 patent") (collectively, the "PureShield Patents").  *See* Exs. A-J.

Case 1:20-cv-01025-NCT-LPA   Document 1   Filed 11/13/20   Page 2 of 37

3.     Plaintiffs' products are based on antimicrobial formulations registered with the Environmental Protection Agency ("EPA"), and the products are non-toxic, non-leaching, and highly durable.  In other words, Plaintiffs' products are based on chemistry that is safe for humans and the environment alike.  When applied to a surface or incorporated into a material, Plaintiffs' products bond strongly to the surface to create a micro-biostatic antimicrobial coating.  This coating in turn forms a nano bed of spikes electrically charged to attract pathogens and destroy them by biomechanically piercing cells and rupturing their membranes.  Plaintiffs' products have a shelf-life of at least one year, and can be applied to not only a variety of porous and non-porous surfaces, but can also be incorporated into manufacturing processes for textiles, plastics, and metals.   When applied to surfaces, the formulations provide continuous protection against pathogens for up to 90 days.



*See* https://youtu.be/r2ZjGvJvdH4.

4. Plaintiffs' EPA-registered products are today successfully used in numerous public environments, including medical facilities, schools, households, transportation, aviation, automotive interiors, marine vessels, commercial facilities, hospitality, fitness centers, and correctional facilities. Unlike conventional products, the Plaintiffs' products do not include poisons, phenols, or heavy metals. Not only are the chemical formulations safe and effective, they also avoid the formation of super bugs that arise from the use of conventional antimicrobials.

5. To protect their rightful investments and patent rights, Plaintiffs have been enforcing the PureShield Patents against infringers that have flooded the market in recent years—especially after the COVID-19 pandemic began. Plaintiffs have all substantial rights in and to the PureShield Patents, including the full and unfettered rights to practice, license, and enforce the PureShield Patents under the patent laws of the United States. As detailed herein, Defendants knowingly conveyed all substantial rights in and to the PureShield Patents to Plaintiffs by way of a license agreement executed in 2014 ("License Agreement"). *See* Ex. K.

6. Defendants, however, are now actively undermining and contravening the very same rights they have conveyed to Plaintiffs. Defendants have, in fact, recently asserted in public court filings that Plaintiffs purportedly have no rights to practice, license, or enforce any of the PureShield Patents. Defendants have also perpetuated this false assertion through statements to customers and users in the

4

market. Moreover, Defendants have been actively colluding with competitors in an effort to vitiate and improperly attempt to redistribute Plaintiffs' rights to the PureShield Patents. Defendants' illegal activities even include direct collaboration with accused infringers in violation of the License Agreement. By actively undermining Plaintiffs' rights and commercial interests, Defendants have materially breached their obligations under the License Agreement, engaged in unfair competition, tortiously interfered with Plaintiffs' existing and prospective business relations, and defrauded Plaintiffs. Plaintiffs, therefore, file this action to protect their investments, patent rights, and good will in the industry.

## THE PARTIES

7.     PureShield, Inc. is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 5500 North Military Trail, Jupiter, Florida 33458. PureShield is a leading supplier of innovative and safe antimicrobial solutions that combat the spread of pathogens. PureShield is a wholly-owned subsidiary of ViaClean.

8.     ViaClean Technologies, LLC is a limited liability company organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 230 South Broad Street, Suite #1201, Philadelphia, Pennsylvania 19102. ViaClean is a leading supplier of innovative and safe antimicrobial solutions that combat the spread of pathogens.

5

9.     Upon information and belief, Inhold, LLC is a limited liability company organized and existing under the laws of the State of North Carolina, with its principal place of business at 2319 Joe Brown Drive, Greensboro, North Carolina 27405.  Upon information and belief, Inhold is owned in its entirety by Novalent, Ltd.

10.     Upon information and belief, Novalent, Ltd., formerly known as Indusco, Ltd., is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business at 2319 Joe Brown Drive, Greensboro, North Carolina 27405.  Upon information and belief, Novalent is the sole member and owner of Inhold.

11.     Upon information and belief, Inhold and Novalent share the same corporate offices, have the same directors and officers, and are operated under the same management.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338, 1367, and 2201.

13.     This Court has personal jurisdiction over each of the Defendants. Defendants have established minimum contacts within this forum such that the exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice.  Specifically, Defendants maintain their principal place of

business in Greensboro, North Carolina, and thus are subject to this Court's jurisdiction. Moreover, Defendants regularly transact business in this Judicial District and have committed and continue to commit in this Judicial District illegal activities as alleged in this Complaint. Inhold has expressly consented to this Court's jurisdiction. Ex. K § VI(e). As Inhold's legal representative, successor, or assign, Novalent has equally consented to this Court's jurisdiction. *Id.* § VI(c).

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b)–(d). Defendants maintain a regular and established place of business in this Judicial District and have committed in this Judicial District illegal activities that give rise to the controversies alleged in this Complaint.

## FACTUAL BACKGROUND

### *History Leading Up To The License Agreement*

15. The parties to this action share a historical relationship that informs the framework and intent underlying the License Agreement. In January 2007, Messrs. Joseph Raich and Joe Mason formed Inhold as a North Carolina limited liability company—each having equal ownership and management rights. At the same time, Mr. Mason owned and operated an entity formed in 1981 under the name Indusco, Ltd. ("Indusco"). Indusco is now known as Novalent, a name change that occurred in April 2020.

7

16.    Inhold operated as merely a holding company for Indusco and the management of the two entities substantially overlapped.  That overlapping structure and operational identity continues through today between Inhold and Novalent.  Novalent is now the sole member and owner of Inhold, and the two entities operate from the same offices, have the same officers and management, and operate as a single enterprise.

17.    On July 13, 2007, Inhold acquired by assignment the '869 patent, the '815 patent, the '587 patent, and the '172 patent.  Exs. L-O.  Until the License Agreement years later, Inhold did not license these patents to any third party after they were acquired.  Over the course of several years, a dispute arose between Messrs. Raich and Mason regarding these acquired patents.  Mr. Mason refused to exploit the patent rights and abandoned any intent to enforce them or license them for royalties to third parties.  Mr. Mason, in fact, allowed the related U.S. Patent No. 6,469,120—that Inhold had also acquired on July 13, 2007—to lapse and become abandoned for failure to pay the required maintenance fees.

18.    In contrast, Mr. Raich expressed a vital interest in preserving and exploiting the commercial and proprietary interests in these acquired patents.  The dispute ultimately ensued in an arbitration between the parties.

19.    In July 2008, Mr. Raich formed PureShield as a Florida corporation.  PureShield is now a wholly-owned subsidiary of ViaClean.

8

20.     In 2014, Mr. Mason—acting on behalf of and through Indusco (now Novalent)—sought to acquire Mr. Raich's ownership interests in Inhold. During discussions, Mr. Raich expressed that he would sell his ownership *only* if PureShield received a license from Inhold conveying all substantial rights to the PureShield Patents. Importantly, Mr. Raich insisted that such a license from Inhold must include full and unfettered rights to practice, license, and enforce the PureShield Patents as well as other intellectual property related to PureShield's business.

### The License Agreement Conveys All Substantial Rights

21.     On September 30, 2014, Mr. Raich executed a Membership Purchase Agreement that sold his Inhold ownership interests to Indusco (now Novalent) *subject to* a license from Inhold that satisfied the conditions expressed by Mr. Raich. On the same date, Mr. Raich signed a signature page to a purported license. As Mr. Raich subsequently ascertained, the purported license did not comply with his conditions.

22.     On October 15, 2014, an "Amended and Restated License Agreement" was executed between Inhold, Indusco (now Novalent), and PureShield. Ex. K. It "amends, restates, and supersedes in its entirety that certain License Agreement dated September 30, 2014." *Id.* at Preamble. The License Agreement was the most important and material consideration provided to PureShield in order for Indusco (now Novalent) to acquire Mr. Raich's ownership interests in Inhold.

9

23.     The License Agreement defines the "LICENSED INTELLECTUAL PROPERTY" as "*the Patents*, and reissues, continuations-in-parts, divisions, *or other U.S. patents issuing from applications filed by or for Licensor* claiming priority from *or for substantially the same subject matter disclosed in the Patents*, (ii) the Trademarks and (iii) the EPA Registrations." *Id.* at § I(a) (emphases added). The PureShield Patents, therefore, include all patents identified in Exhibit A to the License Agreement *and* "other U.S. patents issuing from applications filed by or for Licensor . . . *for substantially the same subject matter disclosed in the Patents*." *Id.* (emphases added).

24.     The License Agreement confers to PureShield unfettered, worldwide rights to "make, use, sell, incorporate with other products, distribute, have made and offer to sell PRODUCTS in the LICENSED TERRITORY: World Wide." *Id.* at § II. The products are defined as "solutions which embody the use of the LICENSED INTELLECTUAL PROPERTY." *Id.* at § I(c). It also grants PureShield unfettered rights to sublicense the PureShield Patents. *Id.* at §§ VI(d), (i).

25.     The License Agreement further confers the full and unfettered right to "PureShield and its assigns and sublicensees [to] *prosecute and bring any and all actions for infringement* of any of the LICENSED INTELLECTUAL PROPERTY by third parties." *Id.* at § VI(i) (emphases added). Pursuant to the clear and unambiguous terms of the License Agreement, PureShield has the right to bring any

10

and all actions for infringement against any infringer <u>without first providing any</u> <u>notice to Defendants</u>. Moreover, the License Agreement requires that "*Licensor* *[Inhold]* ***shall*** *reasonably cooperate with PureShield* with respect to any such action" brought by PureShield its assigns or sublicensees. *Id.* (emphasis added).

26.     Importantly, the License Agreement also separately provides that "in the event PureShield or its assigns or sublicensees is unable to prosecute or bring any action for infringement of any of the LICENSED INTELLECTUAL PROPERTY because such party lacks standing, *Licensor [Inhold]* ***shall, at*** ***PureShield's direction and expense***, ***bring such action on behalf of PureShield*** *or* *its assign or sublicensee*." *Id.* (emphases added). Accordingly, PureShield has the right to recover any infringement damages from enforcing the PureShield Patents, with no obligation to share any such damages at all with Inhold or Novalent.

27.     Pursuant to the License Agreement, PureShield is only required to pay Indusco—*not* Licensor Inhold—a set purchase price for any "72% product purchased by PureShield *from Indusco*." *Id.* at § III(a) (emphasis added). PureShield is otherwise "***not*** [] ***required to pay any royalty*** in connection with any PRODUCT made, used, and/or sold by or for PureShield." *Id.* at § III(c) (emphases added). In other words, PureShield is neither required to purchase any products from Inhold or Indusco (now Novalent), nor is it required to pay any royalties for products made, used, or sold under the License Agreement.

11

28.     In material consideration for obtaining Mr. Raich's Inhold ownership interests, the License Agreement conveys to PureShield an unfettered, worldwide right to practice, license, and enforce the PureShield Patents without any royalty requirements.  Those are all substantial rights tantamount to an assignment under the patent laws of the United States.  PureShield, therefore, is the effective patentee under United States patent law with all substantial rights tantamount to an assignment of the PureShield Patents by the very terms of the License Agreement to which Defendants are both signatories.

### *The License Agreement Extends To And Is Binding Upon Novalent*

29.     The License Agreement is "*binding upon* and inure[s] to the benefit of Licensor, its legal representatives, *successors* and assigns."  *Id*. § VI(c) (emphases added).  Upon information and belief, Indusco acquired all ownership rights to Inhold in or around August 2015 and became Inhold's sole member.  Indusco is, therefore, Inhold's successor and is equally bound by the License Agreement.  In April 2020, Indusco changed its name to Novalent—which remains Inhold's successor.

30.     Upon information and belief, Inhold and Indusco (now Novalent) are also alter egos under North Carolina law.  Upon information and belief, they have been operating from the same offices, have the same officers and management, and effectively operate as a single enterprise.  Indusco is also expressly named as a party

12

to the License Agreement and Mr. Mason signed on behalf of both Inhold and Indusco.  *See* Ex. K.

### The PureShield Patents

31.     The License Agreement expressly identifies the '869 patent, the '815 patent, the '587 patent, and the '172 patent as PureShield Patents.  The patent that Mr. Mason allowed to lapse is crossed-out in Exhibit A and initialed by Mr. Mason as "J.C.M.".  As defined by the License Agreement, the PureShield Patents also include "other U.S. patents issuing from applications filed *by or for Licensor . . . for substantially the same subject matter disclosed in the Patents . . .*"  Ex. K at § I(a) (emphasis added).  For at least the reasons stated above, Novalent is the successor or alter ego of Inhold.  In either case, Novalent is deemed the Licensor under the License Agreement.

32.     Starting in April 2015, *several months after the License Agreement was executed*, Novalent began filing six patent applications for substantially the same subject matter disclosed in the four patents that are identified in the License Agreement.  Those six new patent applications were ultimately allowed and issued as the '384 patent, the '120 patent, the '080 patent, the '020 patent, the '553 patent, and the '664 patent.  These six patents are also PureShield Patents because they are "for substantially the same subject matter" as the patents listed in the License Agreement.

13

33.     The PureShield Patents all disclose substantially similar subject matter of water-stable organosilanes, including silanol quaternary ammonium compounds ("SQACs").  SQACs are organic compounds and a category of organosilanes that comprise a quaternary ammonium group as shown in the general structure (I):



(I)

34.     SQACs comprise a silicon atom (orange) that is bound to three alkoxy or hydroxy groups (red).  In the case of alkoxy groups, groups $R_1$ through $R_3$ represent alkyl groups (*i.e.*, hydrocarbon groups), such as methyl ($CH_3$–) groups or ethyl ($CH_3$-$CH_2$–) groups.  In the case of hydroxy groups, groups $R_1$ through $R_3$ represent hydrogen atoms.  The silicon atom is also bound, via an alkylene bridge (*i.e.*, a hydrocarbon bridge, highlighted in purple), to a quaternary ammonium group (shown in green box).  The quaternary ammonium group is made up of a nitrogen atom (highlighted in blue) that has a permanent positive charge and that is bound to three groups, labeled as groups $R_4$ through $R_6$.  These groups $R_4$ through $R_6$ are typically alkyl (*i.e.*, hydrocarbon) groups or aromatic (*i.e.*, cyclic hydrocarbon groups with conjugated double bonds).

14

35. Because the nitrogen atom in SQACs has a permanent positive charge, SQACs will be accompanied by a negatively charged counterion, represented by X⁻ in general structure (I). SQACs such as 3-(trimethoxysilyl)propyl octadecyldimethyl ammonium chloride ("Trimethoxy") and 3-(trihydroxysilyl)propyl octadecyldimethyl ammonium chloride ("Trihydroxy") can be used as antimicrobial agents.



Trimethoxy                    Trihydroxy

*See generally* PureShield Patents.

Case 1:20-cv-01025-NCT-LPA   Document 1   Filed 11/13/20   Page 15 of 37

36.     In the case of Trimethoxy, the silicon atom (orange) is bound to three methoxy groups (red) and to an N,N-dimethyl-N-octadecyl ammonium group (green) via a propylene bridge (highlighted in purple).  In the case of Trihydroxy, the silicon atom (orange) is bound to three hydroxy groups (red) and to an N,N-dimethyl-N-octadecyl ammonium group (green) via a propylene bridge (highlighted in purple).

37.     The structures of Trimethoxy and Trihydroxy are nearly identical—the only difference being that Trimethoxy has three methoxy (–O-CH$_3$) groups and Trihydroxy has three hydroxy (–OH) groups.  In fact, Trihydroxy is the direct result of Trimethoxy being in water or an aqueous solution.  *See*, *e.g.*, Ex. A at 1:51-56.  In other words, providing Trimethoxy in an aqueous solution will hydrolyze it and thus turn it into Trihydroxy:



38.     SQACs like Trimethoxy and Trihydroxy bind to surfaces to form a thin, durable coating on various surfaces, like metal, plastic, textiles, and wood.  The SQACs can bind to surfaces because the silanol portion (1) covalently binds to the hydroxide or oxide moieties on surfaces and (2) homopolymerizes via a condensation mechanism to form a durable, three-dimensional cross-linked polymer matrix.



39.     The resulting SQAC coatings are antimicrobial because the quaternary ammonium portion attracts pathogens and disrupts their electrical equilibrium.  Such disruption causes the death of pathogen cells.  Moreover, SQACs can bind to natural and synthetic substrates to produce an antimicrobial coating on those substrates.

17

*Id.* at 1:47-63. That is, organosilane compounds like SQACs can attach to the surface of various materials and form an antimicrobial layer on the surface of those materials.

40. SQACs are applied to substrates by dissolving them in a solvent, such as methanol, and applying the resulting SQAC solution to a substrate. *Id.* at 2:32-52. However, these SQAC solutions can be toxic because of the solvent selected to dissolve the SQAC. *Id.* at 2:32-43. To avoid solvent-associated toxicity, dissolving organosilane compounds like SQACs in water is preferable. *Id.* at 2:52-59.

41. SQACs are, however, unstable in water. *Id.* at 2:7-10. As a result, SQACs in water begin to lose effectiveness within a few hours. *Id.* at 2:10-13. Moreover, SQACs self-condense—that is, SQAC molecules react with each other— which increases the viscosity of SQAC formulations and makes them difficult to apply to surfaces. *Id.* at 2:7-10, 2:13-15; *see also* Ex. E at 2:29-36.

42. The PureShield Patents all disclose and claim the use of stabilizers in the SQAC aqueous formulations so as to achieve stabilization and prevent self-condensation. *See, e.g.*, Ex. E at 2:50-53, 3:5-21. By way of non-exhaustive examples, these stabilizers include polyols, ethers, esters, carbonates, and essential oils. *See, e.g.*, Ex. A at 3:1-11; Ex. B at 3:6-13; Ex. D at 3:6-10; Ex. E at 3:11-21. By including a stabilizer, the resulting aqueous SQAC formulations are stable and have a long shelf-life. A review under proper application of United States patent

18

law shows that the six patents issued from Novalent's application are "*for substantially the same subject matter disclosed in the Patents*" that are expressly identified in the License Agreement. Ex. K at § I(a) (emphasis added).

43. Applying principles of claim construction and interpretation of the disclosures under federal patent law, a person skilled in the art would understand the disclosed subject matters are substantially the same. *See* Ex. A at 28:15-23 ("It will be apparent to those skilled in the art that various modifications and variations can be made in the present invention without departing from the scope or spirit of the invention. Other embodiments of the invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein."); *see also* Ex. B at 24:53-67; Ex. C at 28:28-37; Ex. D at 25:13-27.

44. All PureShield Patents are, therefore, properly included within the scope of the License Agreement. PureShield, therefore, has all substantial rights in and to these PureShield Patents tantamount to an assignment under United States patent laws.

### The License Agreement Remains In Force

45. The License Agreement is valid and remains in force. It provides that "this Agreement shall continue in force from the date hereof and continue until ***all of the following*** have occurred: (1) *All of the registration terms of the Patents*, any reissues, continuations, continuations-in-parts, divisions, or *other U.S. patents*

19

*issuing from applications filed by or for Licensor . . . for substantially the same subject matter disclosed in the Patents have expired*; (2) All of the registration terms of the Trademarks have expired; and (3) All of the registration terms of the EPA Registrations have expired." Ex. K at § V(a) (emphases added).

46.     The registration terms of at least six PureShield Patents are not expired. Upon information and belief, the registration terms of the licensed trademarks and EPA registrations have also not expired. The License Agreement, therefore, remains in full force and effect.

### Defendants' Illegal Conduct

47.     Since execution of the License Agreement, Defendants have engaged in a pattern of undermining and obstructing Plaintiffs' rights in and to the PureShield Patents.

48.     Within only months after knowingly conveying all substantial rights to PureShield, Defendants began their misconduct by first concealing the filing of six patent applications for substantially the same subject matter disclosed in the initial four PureShield Patents. Defendants neither informed PureShield of these filings, nor ensured that the initial four PureShield Patents are properly referenced in the disclosures of the six new patent applications. Even though Inhold has been traditionally the holding company for Novalent, Defendants instead named Indusco (now Novalent) as the applicant for these applications. Upon information and belief,

20

this strategy was specifically crafted in an attempt to illegally circumvent the License Agreement.

49.    Plaintiffs have also recently learned that, during approximately the same timeframe in 2015, Defendants began a campaign of undermining Plaintiffs' exclusive rights to the PureShield Patents.  Upon information and belief, Defendants have attempted to further license the patents to third parties in direct contravention of Plaintiffs' exclusive rights.  Upon information and belief, such third parties have operated under the false assumption that they have a license—implied or otherwise—to the PureShield Patents.

50.    In doing so, Defendants have violated Plaintiffs' rights to the PureShield Patents.  Plaintiffs became the effective patentee with the conveyance of all substantial rights to the PureShield Patents.  Defendants have violated Plaintiffs' substantial rights conveyed under the License Agreement, including Plaintiffs' full and unfettered right to enforce the PureShield Patents against third parties.

51.    Upon information and belief, Defendants have interfered with Plaintiffs' exclusive rights by selling compositions to competitors that use those compositions in the manufacture of their own infringing products.  Upon information and belief, Defendants have known that the compositions are used in manufacturing infringing products.  Upon information and belief, Defendants have also known that such infringing products are used directly to compete against Plaintiffs.

52.     Upon information and belief, Defendants have engaged in this illegal conduct to undermine Plaintiffs' rights to the PureShield Patents.  Defendants' illegal conduct is in violation of the License Agreement, and in direct contravention of the express intent underlying the conveyance of all substantial rights to Plaintiffs. To acquire Mr. Raich's ownership in Inhold, Defendants knowingly entered into a binding License Agreement that grants PureShield all substantial rights to the PureShield Patents—only to turn around and undermine the very same rights granted to PureShield.  Defendants' deceptive and fraudulent conduct has been irreparably harming Plaintiffs.

53.     Defendants' illegal campaign against Plaintiffs has consistently escalated over the years.  Recently, Defendants have asserted in public court filings that Plaintiffs purportedly have no rights to practice, license, or enforce the PureShield Patents.  *See Inhold, LLC and Novalent, Ltd. v. PureShield, Inc. et al.*, No. 20-cvs-4841 (N.C.B.C.) ("State Court Case"), at ECF No. 49.

54.     In a letter to Plaintiffs sent on the day this complaint was filed, Defendants have further asserted that Plaintiffs have no rights whatsoever in the PureShield Patents.  Upon information and belief, Defendants have also perpetuated these false assertions through statements made to third parties in the antimicrobial protectant industry, including Plaintiffs' existing customers, potential customers, and accused infringers that have received notices from Plaintiffs.  *See generally id.*

55.     Upon information and belief, Defendants have also been collaborating with infringing competitors in direct violation of the License Agreement and in derogation of Plaintiffs' rights to the PureShield Patents.  By way of example, Plaintiffs have filed an infringement suit against Allied BioScience, Inc.  *See PureShield Inc. v. Allied BioScience, Inc.*, No. 4:20-cv-00734-SDJ (E.D. Tex.). Upon information and belief, Defendants have been directly collaborating with Allied BioScience in connection with its defense in that litigation.  *See* State Court Case at ECF No. 49 at 6.

56.     In a letter to Plaintiffs sent on the day this complaint was filed, Defendants have even demanded that Plaintiffs dismiss the infringement action against Allied BioScience.  Defendants expressly threatened legal action against Plaintiffs, if Plaintiffs refuse to dismiss the infringement action against Allied BioScience.  Defendants' letter came from its counsel, but also copied counsel for accused infringer Allied BioScience.

57.     Moreover, Defendants have asserted in public court filings that Plaintiffs sent "approximately a dozen" infringement notices to competitors. *See* State Court Case at ECF No. 48.2 ¶ 120.   Upon information and belief, Defendants have obtained this information through communications with accused infringers.  *Id.* ¶ 119.

23

58.     Upon information and belief, Defendants are actively collaborating with accused infringers in order to undermine Plaintiffs' rights and interests. Defendants are doing so even though, as Defendants are fully aware, Plaintiffs have full and unfettered rights to enforce the PureShield Patents, and despite the License Agreement's express requirement that Defendants *cooperate with PureShield*—or its assigns and sublicensees—in any infringement action brought to enforce the PureShield Patents. *See* Ex. K at § VI(i).

59.     As a result of Defendants' illegal conduct, Plaintiffs have been and continue to be irreparably and monetarily harmed.  Plaintiffs have all substantial rights to the PureShield Patents under United States patent law and should be afforded the opportunity to exercise those rights without Defendants' continuous and illegal impediments to such a rightful exercise.

## COUNT I:  DECLARATORY JUDGMENT

60.     Each of the allegations set forth in Paragraphs 1-59 of this Complaint is incorporated by reference and realleged.

61.     Plaintiffs and Defendants are parties to and bound by the License Agreement.  As conveyed through the License Agreement, Plaintiffs have all substantial rights in and to the PureShield Patents tantamount to an assignment under United States patent law.  In accordance with these rights, Plaintiffs have been

enforcing the PureShield Patents under 35 U.S.C. §§ 271 *et seq.* against accused infringers that practice the PureShield Patents without Plaintiffs' authorization.

62.     Defendants have asserted in public court filings that Plaintiffs purportedly have no rights to practice, license, or enforce the PureShield Patents. In a recent letter to Plaintiffs, Defendants have similarly charged that Plaintiffs have no rights whatsoever in the PureShield Patents.

63.     In that letter, Defendants also expressly demanded that Plaintiffs dismiss an ongoing infringement action against a third-party infringer. Defendants threatened legal action against Plaintiffs, if that infringement action against Allied BioScience is not voluntarily dismissed. Moreover, Defendants threatened to seek any and all appropriate legal protection and remedy against Plaintiffs with respect to the ownership of the PureShield Patents.

64.     As pleaded in Paragraphs 15-59, Defendants have engaged in concerted efforts to undermine Plaintiffs' rights in and to the PureShield Patents. Defendants have actively collaborated with infringing competitors in direct violation of the License Agreement and in derogation of Plaintiffs' rights to the PureShield Patents.

65.     Defendants' assertions and actions give rise to an actual and justiciable controversy between the parties regarding the allocation of rights with respect to the PureShield Patents, including whether Plaintiffs have the rights to practice, license, and enforce the PureShield Patents.

25

66.     Plaintiffs, therefore, bring this action for declaratory judgment that Plaintiffs have all substantial rights to the PureShield Patents tantamount to an assignment, including the full and unfettered, worldwide rights to practice, license, and enforce the PureShield Patents.  Plaintiffs have been and will continue to be irreparably harmed absent an injunction against Defendants.

## COUNT II:  BREACH OF CONTRACT

67.     Each of the allegations set forth in Paragraphs 1-66 of this Complaint is incorporated by reference and realleged.

68.     Upon information and belief, Defendants have breached the License Agreement in violation of North Carolina law.

69.     Plaintiffs and Defendants are parties to and bound by a valid contract. The License Agreement is "*binding upon* and inure[s] to the benefit of Licensor, its legal representatives, *successors* and assigns."  *Id*. § VI(c) (emphases added).  Upon information and belief, Indusco acquired all ownership rights to Inhold and is Inhold's sole member.  Indusco is, therefore, Inhold's successor and is equally bound by the License Agreement.  Indusco has changed its name to Novalent—which remains Inhold's successor.

70.     Upon information and belief, Inhold and Indusco (now Novalent) are also alter egos under North Carolina law.  They operate from the same offices, have the same officers and management, and effectively operate as a single enterprise.

26

Indusco (now Novalent) is also expressly named as a party to the License Agreement and Mr. Mason signed on behalf of both Inhold and Indusco. Ex. K.

71. The License Agreement is also binding upon and inures to the benefit of PureShield and its successors, assigns, and sublicensees. *Id*. § VI(d). PureShield is a wholly-owned subsidiary of ViaClean. ViaClean is, therefore, PureShield's successor and assign based on the "sale or transfer of all or substantially all of the business to which this [License] Agreement pertains." *Id.*

72. As pleaded in Paragraphs 15-59, Defendants have breached the terms of the License Agreement in several respects. Upon information and belief, Defendants have consistently engaged in concerted efforts to undermine and vitiate Plaintiffs' rights in and to the PureShield Patents. Defendants' actions are in violation of the express terms of the License Agreement and constitute a material breach of the License Agreement.

73. Upon information and belief, Defendants have attempted to either license the patents to third parties or authorize third parties to practice the PureShield Patents in direct contravention of Plaintiffs' rights under the License Agreement. In doing so, Defendants have violated and contravened Plaintiffs' rights, including the full and unfettered rights to enforce the PureShield Patents against any third parties.

27

74.     Defendants have further sought to vitiate Plaintiffs' rights under the License Agreement by asserting in public court filings that Plaintiffs purportedly have no rights to practice, license, or enforce the PureShield Patents.  Upon information and belief, Defendants have further perpetuated this false assertion through statements made to third parties in the antimicrobial protectant industry. These actions are in direct contravention of the License Agreement and constitute a material breach of the License Agreement.

75.     Upon information and belief, Defendants have also been cooperating with infringing competitors in violation of the License Agreement.  Upon information and belief, Defendants have been collaborating with Allied BioScience in defending against the infringement suit brought by Plaintiffs.

76.     In a recent letter to Plaintiffs, Defendants have even demanded that Plaintiffs dismiss the infringement action against Allied BioScience.  Defendants expressly threatened legal action against Plaintiffs, if the infringement action against Allied BioScience is not voluntarily dismissed.  Defendants' letter came from its counsel, but also copied counsel for accused infringer Allied BioScience.

77.     Moreover, Defendants have recently asserted in public court filings that Plaintiffs sent "approximately a dozen" infringement notices to competitors. *See* State Court Case at ECF No. 48.2 ¶ 120.  Upon information and belief, Defendants have obtained this information directly through communications with

accused infringers. Defendants, in fact, indicate that this information was not obtained from Plaintiffs. *Id.* ¶ 119.

78.     Upon information and belief, Defendants are thus cooperating with Allied BioScience and other accused infringers to the detriment of Plaintiffs and in direct violation of the License Agreement. By way of its collaboration with accused infringers, Defendants have breached their express obligations to cooperate *with PureShield*—or its assigns and sublicensees—in any infringement action brought to enforce the PureShield Patents. *See* Ex. K at § VI(i). Moreover, Defendants' statements and actions contravene Plaintiffs' full and unfettered rights to enforce the PureShield Patents under the License Agreement.

79.     Defendants' illegal actions constitute a material breach of the License Agreement. As a result of Defendants' breach of contract, Plaintiffs have been and continue to be irreparably and monetarily harmed.

## COUNT III: FRAUD

80.     Each of the allegations set forth in Paragraphs 1-79 of this Complaint is incorporated by reference and realleged.

81.     Upon information and belief, Defendants have defrauded Plaintiffs in violation of North Carolina law. As pleaded in Paragraphs 15-59, Defendants have engaged in conduct that amounts to either actual or constructive fraud under North Carolina law.

29

82.     In particular, the License Agreement was based on representations by Inhold and Indusco (now Novalent) in 2014, that Indusco (now Novalent) will acquire a majority ownership stake in Inhold in return for and subject to PureShield acquiring all substantial rights in and to the PureShield Patents. Those include full and unfettered, worldwide rights to practice, license, and enforce the PureShield Patents. These rights were the most important and material consideration provided to PureShield in order for Indusco (now Novalent) to acquire the ownership interests in Inhold.

83.     Inhold and Indusco (now Novalent) knew that the rights to and in the PureShield Patents were the most material consideration for the transaction. The parties executed a Membership Purchase Agreement that sold the Inhold ownership interests to Indusco (now Novalent) *subject to* a license from Inhold to PureShield— a license agreement that Indusco (now Novalent) ***also signed***. The parties knew that such license from Inhold must convey all substantial rights to the PureShield Patents and that the plain terms of that agreement were tantamount to an assignment under United States patent law. Importantly, Mr. Raich stated that the license from Inhold must include full and unfettered rights to practice, license, and enforce the PureShield Patents as well as other intellectual property related to PureShield's business.

30

84.     The circumstances surrounding the License Agreement created the relation of confidence between the parties.  Based on these circumstances and the understanding of the parties, Novalent would acquire the ownership rights in Inhold from PureShield's principal in exchange for Inhold's conveyance of all substantial rights in and to the PureShield Patents to PureShield.

85.     PureShield relied on these representations to consummate the transaction.  Novalent and Inhold received the benefit by taking advantage of the trust, only to turn around and wage a campaign against PureShield's intended and conveyed rights under the License Agreement.  Upon information and belief, Inhold and Indusco (now Novalent) intended to deceive PureShield by subsequently undermining PureShield's rights acquired in and to the PureShield Patents.

86.     Upon information and belief, Defendants have since engaged in a campaign to undermine and vitiate the rights granted to PureShield under this transaction.  By way of example, Defendants have sought to license and authorize third parties to practice the PureShield Patents.  As pleaded in Paragraphs 15-79, Defendants have also directly colluded with accused infringers in derogation and violation of Plaintiffs' rights.

87.     Defendants' actions constitute actual or constructive fraud under North Carolina law.  As a result of Defendants' fraud, Plaintiffs have been and continue to be irreparably and monetarily harmed.

31

## COUNT IV:  UNFAIR COMPETITION

88.    Each of the allegations set forth in Paragraphs 1-87 of this Complaint is incorporated by reference and realleged.

89.    Upon information and belief, Defendants have been unfairly competing and continue to unfairly compete with Plaintiffs in violation of North Carolina's Unfair and Deceptive Trade Practices Act under N.C. Gen. Stat. §§ 75 *et seq*.

90.    Upon information and belief, Defendants have engaged in a pattern of unfair competition against Plaintiffs.  Upon information and belief, Defendants have been attempting to license and authorize third parties to practice the PureShield Patents in violation and derogation of Plaintiffs' rights.  Upon information and belief, such third parties have operated under the false assumption that they have a license—implied or otherwise—to the PureShield Patents.

91.    Upon information and belief, Defendants have interfered with Plaintiffs' exclusive rights by selling compositions to competitors that use those compositions in the manufacture of their own infringing products.  Upon information and belief, Defendants have known that the compositions are used in manufacturing infringing products.  Upon information and belief, Defendants have also known that such infringing products are used directly to compete against Plaintiffs in the same market.

32

92.     Upon information and belief, Defendants have been actively collaborating with infringing competitors in derogation of Plaintiffs' rights to the PureShield Patents and in derogation of the resulting market exclusivity.   Upon information and belief, Defendants have been directly collaborating with accused infringers such as Allied BioScience.

93.     Recently, Defendants have also asserted that Plaintiffs purportedly have no rights to practice, license, or enforce the PureShield Patents.   Upon information and belief, Defendants have also perpetuated these false assertions through statements made to third parties in the antimicrobial protectant industry, including Plaintiffs' existing customers, potential customers, and accused infringers that have received notices from Plaintiffs.

94.     Defendants' illegal actions affect commerce by usurping Plaintiffs' rights and unlawfully conferring them on third parties in the market.  Plaintiffs have all substantial rights in and to the PureShield Patents, including the right to exclude any third parties from practicing the PureShield Patents.  Moreover, Defendants' unfair competition affects commerce by inducing market competition through the infringement of intellectual property rights.

95.     As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered a loss of market share, reduction in the value of its business, and extensive costs to counteract Defendants' illegal actions.

33

96.     Defendants' unfair competition has caused, is causing, and continues to be causing immediate and irreparable injury to Plaintiffs, both by direct diversion of sales and by harming Plaintiffs' reputation and good will in the industry.

## COUNT V:  TORTIOUS INTERFERENCE

97.     Each of the allegations set forth in Paragraphs 1-96 of this Complaint is incorporated by reference and realleged.

98.     Upon information and belief, Defendants have tortiously interfered and continue to tortiously interfere with Plaintiffs' existing and prospective business relations in violation of North Carolina's tortious interference common law.

99.     Upon information and belief, Defendants have been representing to third parties that they have the exclusive rights to the PureShield Patents and that Plaintiffs purportedly have no rights to practice, license, or enforce the PureShield Patents.  As a result of these false representations, Defendants have intentionally induced third parties not to maintain or enter into contractual relations with Plaintiffs.

100.    Upon information and belief, these third parties include existing customers, potential customers, and accused infringers that have received infringement notices from Plaintiffs.  Upon information and belief, such third parties would have otherwise maintained or entered into contractual relations with Plaintiffs.

34

101.   Defendants' interference with such existing and prospective business relations was not done in the legitimate exercise Defendants' rights.   Under the License Agreement, Defendants lack any basis for the assertion that Plaintiffs cannot practice, license, or enforce the PureShield Patents.

102.   As a direct and proximate result of Defendants' misconduct, Plaintiffs are being and will continue to be suffering injury in the form of actual damages, including lost sales and lost profits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor as follows:

A.   Declaring that Plaintiffs have all substantial rights in and to the PureShield Patents, including the full and unfettered rights to practice, license, and enforce the PureShield Patents;

B.   Permanently enjoining and restraining Defendants and their officers, agents, employees, and those acting in privity with them, from further asserting in any form that Plaintiffs do not have the rights to practice, license, and enforce the PureShield Patents;

C.   Finding that Defendants have breached the License Agreement in violation of North Carolina law;

35

D.      Finding that Defendants have actually and constructively defrauded Plaintiffs in violation of North Carolina law;

E.      Finding that Defendants have unfairly competed against Plaintiffs in violation of North Carolina's Unfair and Deceptive Trade Practices Act under N.C. Gen. Stat. §§ 75 *et seq*.;

F.      Finding that Defendants have tortiously interfered with Plaintiffs' prospective business relations in violation of North Carolina Tortious Interference law;

G.      Permanently enjoining and restraining Defendants and their officers, agents, employees, and those acting in privity with them, from further breaching the License Agreement, perpetuating the actual and constructive fraud on Plaintiffs, unfairly competing against Plaintiffs, and tortiously interfering with Plaintiffs' existing and prospective business relations;

H.      Awarding Plaintiffs damages, including lost profits, disgorgement of profits obtained by Defendants, and treble damages;

I.      Awarding Plaintiffs reasonable attorney fees, costs, and expenses;

J.      Awarding pre-judgment and post-judgment interest to compensate Plaintiffs for the damages it sustained; and

K.      Awarding Plaintiffs any further relief the Court deems just and proper.

36

# JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 13, 2020

/s/ *Jacob Z. Zambrzycki*

Brian Paul Gearing
  (*special appearance to be filed*)
Jacob Z. Zambrzycki (Bar No. 056223)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022-2524
Tel: (212) 223-4000
Fax: (212) 223-4134
bgearing@crowell.com
jzambrzycki@crowell.com

Ali H.K. Tehrani
  (*special appearance to be filed*)
Joshua M. Rychlinski
  (*special appearance to be filed*)
Siri Rao
  (*special appearance to be filed*)
Karla I. Arias
  (*special appearance to be filed*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Tel: (202) 654-2500
Fax: (202) 628-5116
atehrani@crowell.com
jrychlinski@crowell.com
srao@crowell.com
karias@crowell.com

*Attorneys for Plaintiffs PureShield, Inc.*
*and ViaClean Technologies, LLC*

37